In re Camilla Jean STRASSER, Debtor.

Maureen Gaughan, Trustee, Plaintiff,

v.

David W. Cavan and Karen Cavan, husband and wife, Defendants.

Bankruptcy No. 00–14146–PHX–GBN.
Adversary NO. 02–00154.

United States Bankruptcy Court,
D. Arizona.

Jan. 13, 2004.

Steven J. Brown, Steve, Brown & Associates, LLC, Phoenix, AZ, for trustee.

John R. Politan, Politan & Assoc. PLC, Scottsdale, AZ, Howard C. Meyers, Burch & Cracchiolo, P.A., Phoenix, AZ, for Defendants.

## OPINION

GEORGE B. NIELSEN, JR.,
Bankruptcy Judge.

The complaint of Chapter 7 Trustee Maureen Gaughan, to avoid a transfer of sale proceeds by debtor Camilla Jean Strasser ("debtor") to her parents, defendants David W. and Karen Cavan as constructively fraudulent to her existing creditors, was tried to the court as a bench trial. The court has found and concluded that plaintiff's complaint should be sustained. The facts and discussion necessary for an understanding of this decision follow.

### I.

Debtor filed for divorce from Steven L. Strasser on April 2, 1998. A consent decree of dissolution was entered on July 15, 1998. By quit-claim deed dated May 15, 1998, recorded May 18, 1998, Steven L. Strasser transferred all his interest in the family home in Scottsdale, Arizona to debtor. Debtor resided at the residence with her two children, but was unable to make payments on more than $274,000 in consensual liens recorded on the property. As of August 31, 1998, debtor's father, David W. Cavan, had made payments of $32,951.67 to certain creditors of debtor. On that same date, to avoid foreclosure, debtor sold the residence to her father for $345,000. Following payment to secured creditors and closing costs, $62,188.95 in net sales proceeds remained.

The escrow agent issued a check to debtor for $62,188.95. Ms. Strasser did not use these funds to invest in a new homestead or to pay her existing, non-insider creditors. Instead she endorsed the check to her father. Starting after August 31 of 1998, debtor's father made payments of $41,278.50 to a law firm for legal services that benefitted debtor. After the close of the sale, defendants also made funds available to debtor for support of herself and her children, through checks made payable to her, by direct payments to certain creditors and by providing a credit card for her personal use.

Debtor filed a voluntary chapter 7 bankruptcy case in this judicial district on December 28, 2000. She scheduled 69 unsecured claims, including a claim of $150,000 owed to her father. The majority of claims were incurred in connection with her former husband's business or personal credit card debt. The case trustee instituted this adversary proceeding against debtor's parents on February 25, 2003.

David W. Cavan testified that in August of 1998 his daughter, Camilla Jean Strasser was going through a difficult time. Her husband had stopped supporting the family, unpaid creditors were contacting her, the family residence was in foreclosure, her children's expenses were unpaid and she was not employed. To assist her, defendants purchased her home at its appraised value of $345,000, yet allowed debtor and her children to continue to reside there. Defendants were giving her money for food at the time.

Defendants purchased the home with a $69,000 down payment. After payment of liens, a check of $62,188.95 was issued to debtor. Ms. Strasser immediately en-

dorsed the check to her father, pursuant to an alleged prior agreement, to repay his previous loans. Defendant's trial testimony of the existence of a prior agreement was impeached by Mr. Cavan's deposition testimony that Ms. Strasser had volunteered to give him the check and he was unaware why she did so.

At this time, debtor was unemployed, in poor physical and mental condition, under the care of a psychiatrist and unable to pay her debts. It is defendant's testimony that he and debtor had previously agreed he was to take back all her equity of more than $62,000, thus leaving his unemployed daughter and her children nothing to live on, because she was afraid her former husband would take these funds. The fact finder does not find this testimony credible.[1] Defendant also testified debtor wanted him to manage the $62,188.95 proceeds for her, stating "Because, well, partly she owed me part of it, and she just didn't want...at that, juncture she just did not want to have any responsibility of any money and she wanted me, she wanted me to give it back to her over time, which I did, because she had, you know, had kids school to pay and et cetera." Testimony ("test") of David W. Cavan of September 8, 2003, dkt. 51 at p. 5 (citing transcript).

Previously defendants had paid certain of debtor's bills, including costs for a divorce attorney, a private investigator and private school tuition for the children. Defendant Cavan describes this support as a loan, although it was unwritten, carried no interest rate and had no due date. He testified he would never sue his daughter for the money if she failed to repay him. He made similar loans to his other three children, all undocumented and not bearing interest or maturity dates, in amounts

of up to $500,000. Defendant would record his loans and track repayments by his children only through notes in checkbook or yellow post notes. Mr. Cavan was absolutely committed to his daughter and grandchildren and would provide for them whether or not she could pay him back.

Prior to the close of the realty sale, defendants made payments of at least $32,951.67 to certain of debtor's creditors. Mr. Cavan has not demanded his daughter repay this amount, although debtor has stated she will reimburse him. He believes he paid creditors more than $32,951.67, but is unable to provide documentation to establish a larger amount. After the sale closed, defendants paid additional sums to debtor's creditors, utilizing the law firm to negotiate settlements. Payments to the law firm for its representation of debtor in her divorce are reflected in Ex. A. Defendant's practice was to pay the firm when billed. At the closing he was unaware that debtor owed the firm any money. In 1999, he paid $11,800 in tax debts that had been assigned to the debtor in the divorce decree.

The decree required the former spouse to pay debtor approximately $5,000 a month in support, which was paid. Mr. Cavan has never agreed to assume all his daughter's debts or pay creditors more than she agreed to repay. He believes his daughter wanted him to be repaid his $32,951.67 in loans from the equity check she endorsed. He intended to give the remaining $31–32,000 to her over time. Defendant would support his daughter and grandchildren regardless of whether he was repaid. His involvement was due to compelling family reasons.

---

1. It is noted that by this date the husband had already transferred all his interest in the home to debtor by recorded deed, a decree had been entered establishing the parties' respective interests in marital property and the divorce was final. Finding of fact one, *id.*

Currently the home is back in his daughter's name. She has refinanced and retired his loan on the property. Debtor now works for her father as a salaried employee. She still owes him approximately $100,000.

Defendant Karen Cavan was aware of her husband's assistance to debtor because of the love and affection they both hold for their daughter and the children. Although she was not directly involved in his husband's dealings with debtor, she believes there are no conditions on the money they provided. Defendants have never stated they would only provide this support if debtor would pay them back.

Camilla Jean Cavan–Strasser turned to her father for assistance when Steven Strasser stopped paying the family's bills. Defendant assisted her due to his love and affection for her and the children. She intended, at the time she received his assistance, to pay him back someday. Her father did not say he would only help if she repaid him. Her testimony is that she gave her equity check to him because he was handling her financial affairs. This trial testimony conflicts with debtor's prior deposition testimony that she did not recall receiving a check at the closing.

She signed an affidavit which recites that she owed her parents $32,951.67, when she endorsed the check and that the remaining $ 29,237.28 was quickly repaid to her. She signed this affidavit without doing an independent investigation as to how these asserted amounts had been calculated. In her prior deposition she initially testified she did not owe her father money at the time the sale closed. She later amended this testimony by stating she was guessing as to whether she might owe her father money and would need to

see documents. The fact finder does not find this testimony credible. When asked in her deposition whether she had an agreement to repay her father, she testified "No, but someday I . . ." and was cut off by the questioner. Her father settled a number of the claims brought against her. She is in the process of repaying him. She received support of $4,500 monthly from her former spouse, but cannot recall when these payments started.[2]

## II.

Pursuant to 28 U.S.C. § 1334(a), jurisdiction of debtor's bankruptcy case is vested in the United States District Court for the District of Arizona. That court has referred all cases under Title 11 of the United States Code and all adversary proceedings arising under Title 11 or related to a bankruptcy case to this court. 28 U.S.C. § 157(a); Amended District Court General Order 01–15. The proceeding having been appropriately referred, this court has core jurisdiction to enter a final judgment determining whether defendants' actions constitute a constructive fraudulent conveyance. 28 U.S.C. § 157(b)(2)(H). *See also* Joint Pretrial Statement at p. 2, section II. (Stipulating to jurisdiction and venue as a core proceeding).

This court's conclusions of law are reviewed *de novo* and its factual findings for clear error. *Hanf v. Summers (In re Summers)*, 332 F.3d 1240, 1242 (9th Cir. 2003). The appellate court accepts the bankruptcy court's findings, unless upon review, it is left with the definite and firm conviction that a mistake has been committed. *Ganis Credit Corp. v. Anderson (In re Jan Weilert RV, Inc.)* 315 F.3d 1192,

---

**2.** The fact finder notes that debtor was a tentative witness and portions of her testimony apparently required extensive leading questions from her counsel. This does not aid witness credibility.

1196 (9th Cir.), *amended by* 326 F.3d 1028 (9th Cir.2003).

## III.

Section 544(b) of the Bankruptcy Code permits a trustee to stand in the shoes of a creditor to assert any state law claims that a creditor may have. 11 U.S.C. § 544(b); *Kupetz v. Wolf,* 845 F.2d 842, 845 (9th Cir.1988). Here, plaintiff invokes Arizona's version of the Uniform Fraudulent Transfer Act, which provides:

> A transfer made...by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made...if the debtor made the transfer...without receiving a reasonably equivalent value in exchange for the transfer...and the debtor was insolvent at that time or...became insolvent as a result of the transfer....

A.R.S. § 44–1005 (1990).

Defendants do not dispute that debtor was insolvent at the time of the transfer of the sale proceeds. Joint Pretrial Statement, *id.* at p. 2.

## A.

■ The parents defend by arguing debtor received reasonably equivalent value for the $62,188.95 transfer through *inter alia,* the repayment of $32,951.67 in loans she owed defendants at the time. They argue the remainder of the transfer is "remediated" by defendants' post transfer payments to debtor's creditors and support for debtor and her children that far exceed in amount the funds they received at the closing. Clearly these defendants have established that as exemplary, responsible parents, they rescued their daughter and grandchildren through payment of many thousands of dollars to certain of her creditors and for her living expenses, both before and after their receipt of the sale proceeds. Accordingly, as

in *Sahley v. Tipton Co.,* 264 F.Supp. 653, 658 (D.Del.) *aff'd* 386 F.2d 450 (3rd Cir. 1967), their argument that they purged themselves of liability as transferees of a fraudulent transfer by their subsequent transfers back to debtor and a selected number of her creditors is "superficially persuasive." However again, as in *Sahley,* this defense is ultimately ineffective. *Id.* at 658–59.

■ As the party asserting the existence of the undocumented loan, defendants have the burden of proof to establish every element of the oral contract, based on objective evidence. *Tabler v. Industrial Commission of Arizona,* 202 Ariz. 518, 47 P.3d 1156, 1159 (Ariz.App.2002) (citing cases). Under Arizona law, a contract to be legally enforceable must be supported by consideration. A contract is not supported by consideration when a party has made an illusory promise, *i.e.* a promise that leaves the choice of performance entirely to the promisor. *Valdiviezo v. Phelps Dodge Hidalgo Smelter, Inc.,* 995 F.Supp. 1060, 1066 (D.Ariz.1997). That is the situation here. Debtor's "promise" to repay monies spent on her behalf is completely unenforceable by the promisees. First, there is no maturity or payment date of either interest or principal established between the parties-so debtor breaches no covenant by not repaying. Additionally, defendants admit there is no possibility they would ever sue to require repayment. This is hardly surprising. The financial assistance was granted out of defendants' love and affection, no conditions were placed on the money, nor did defendants state they would only provide assistance if they were paid back.

In addition to the technical deficiency of the alleged contract, testimony concerning creation of the alleged loan lacks credibility to this fact finder. Defendant Cavan's trial testimony concerning the circum-

stances of his receipt of the proceeds was impeached by his prior deposition testimony (and by common sense). See direct test. *id.* regarding defendant's taking the $62,188.95 proceeds from debtor, leaving her without any means of support, so his "loan" could be repaid. Also, *see* direct test. of Camilla Jean Cavan–Strasser regarding impeachment by use of her prior deposition testimony concerning the circumstances of the transfer. This fact finder concludes defendants failed to meet their burden to establish the alleged $32,951.67 loan. Accordingly, the defense of reasonably equivalent value by repayment of a pre-existing loan has not been proven.

### B.

■ Defendants also argue they provided reasonably equivalent value by providing post transfer living expenses to debtor and payment to certain of her post transfer creditors. They argue that debtor (and presumably themselves[3]) are allowed to prefer post transfer creditors to the detriment of pre transfer creditors. This argument is foreclosed by the specific wording of the constructively fraudulent transfer statute on which trustee relies: "A transfer...is fraudulent **as to a creditor whose claim arose before the transfer was made...**" A.R.S. § 44–1005 (emphasis added). Thus, payment to subsequent post transfer creditors in no way "remediates" the harm to unpaid pre transfer creditors caused by debtor's transfer. Accordingly defendants acquire no offset to their liability through the subsequent preferential payments to certain of debtor's post transfer creditors.

While it is sufficient to reject this defense simply on the basis of the statute's wording, the trustee has correctly identified the policy furthered by this result:

What is the spirit of the doctrine that allows a fraudulent transfer recipient to escape liability by returning the asset transferred? It is of course that by doing so, the creditors originally hurt are put back into substantially the same position they were in before. That simply didn't happen here. If Defendants prevail under these facts, then any debtor will be given carte blanche to set up this same type of self-settled trust. A debtor faced with massive debts could theoretically take the $1,000,000 stock portfolio they amassed over the years, liquidate it, turn it over to a friend or relative to "manage" for them and over the next several years simply have all their living expenses paid by their "trustee" and claim that they've been repaid the entire $1,000,000.

Plaintiff's opening brief at 7, dkt. 51.

The term "future creditors" in this context is nothing more than a euphemism for preferring **yourself** to your creditors. All that debtor did was move $62,000+ out of reach of her actual creditors, and then use it later whenever and wherever she needed, including thousands each month for new credit card shopping, clothes, groceries, private school tuition etc. These ongoing expenses were not "creditors" future or otherwise, at the time of the transfer. Taking $62,000 and parking it with her father for her own use in the future, and then claiming "no harm no foul, I used it on my future creditors" defies logic.

Plaintiff's reply at 2, dkt. 54. (emphasis original).

---

**3.** Besides being a pre transfer creditor who was paid in full, it was defendant David W. Cavan who, with his attorneys, negotiated settlements with creditors of the debtor on her behalf. Cavan cross-examination test.

Defendant Cavan testified that following the real estate closing, the only pre transfer debt he can establish he paid was $ 11,800 owed by debtor for federal and state income taxes. Cross and redirect test.; exhibit B. Trustee appears to concede that these payments could be credited as reasonably equivalent value. Opening brief at 6, reply at 2, *id.* Except for these payments, the court concludes that defendants' post transfer activities did not produce reasonably equivalent value to debtor's pre transfer creditors.

It bears repeating that trustee has invoked Arizona's constructively fraudulent transfer statute. No proof of intent is required to be established by the trustee. No defense of good faith is available to the defendants. *Hullett v. Cousin,* 204 Ariz. 292, 63 P.3d 1029, 1032 (Ariz.2003), citing *Viscount Air Services, Inc. v. Cole (In re Viscount Air Services, Inc.),* 232 B.R. 416, 445 (Bankr.D.Ariz.1998).

## C.

■ It is surprising to again receive defendants' argument that the sale proceeds cannot be the basis of a fraudulent conveyance suit because they were exempt under Arizona's homestead statute. A.R.S. § 33–1101(C). Opening brief at 20–27, reply at 6–8, *id.* The issue of the alleged exemption was raised through Defendants' motion to dismiss of May 21, 2002. This defense was foreclosed by the oral order denying the motion at the hearing of October 18, 2002.

To briefly recapitulate the earlier ruling, the first reason the funds do not qualify as exempt homestead proceeds is that debtor failed to reinvest them in a new homestead within 18 months as the statute expressly requires. § 33–1101(C), *id.* The second reason is that since debtor transferred the proceeds away to defendants, she has waived the exemption. *Trujillo v. Grim-*

*mett (In re Trujillo),* 215 B.R. 200, 205 (9th Cir. BAP 1997), *aff'd* 166 F.3d 1218 (9th Cir.1998). Third, a transfer by deed of the homesteaded property is deemed an abandonment of the exemption under Arizona law. A.R.S. § 33–1104(A)(2). Finally, even if the funds were exemptible under state law, which they are not, the exemption is lost by application of the bankruptcy code, due to debtor's voluntary transfer of the proceeds. 11 U.S.C. § 522(g)(1)(A), *Trujillo,* 215 B.R. at 204–05, *Mason v. Young (In re Young),* 238 B.R. 112, 115–16 (6th Cir. BAP 1999) (Wife, who received property through a fraudulent conveyance from husband, cannot subsequently exempt the property from a bankruptcy estate after trustee avoids the transfer).

## D.

■ Without citation of direct authority, defendants argue § 522(g) is inapplicable to trustee avoidance actions based on state law. Defendants are misinformed. Federal law continues to impact bankruptcy avoidance actions based on state law. Just as the Bankruptcy Code expressly authorizes trustee avoidance actions based on state law, 11 U.S.C. § 544(b)(1), *Kupetz v. Wolf,* 845 F.2d 842, 845 (9th Cir.1988), *In re Viscount Air Services,* 232 B.R. at 432 (citing cases), it also expressly places controls on § 544 state law avoidance actions. *See, e.g.* § 550(a) (identifying targets of avoidance actions), § 550(b) (eliminating certain transferees as potential defendants), § 550(c) (identifying transfer dates that can be avoided), § 550(d) (limiting recovery to a single satisfaction), § 550(e) (creating liens for good faith transferees) and § 550(f) (imposing a federal statute of limitations). An additional provision of federal law impacting such suits is the prohibition of exemption of trustee § 544 recoveries by debtors who had voluntarily

transferred the property. § 522(g)(1)(A). Had debtor been entitled to the Arizona homestead exemption, this section would prohibit her exemption of the recovered proceeds.

### IV.

Findings, conclusions and a judgment in favor of plaintiff and against defendants have been entered.